**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| JEFFREY SAYWARD and KIM SAYWARD,<br><br>    Plaintiffs<br><br>v.<br><br>ERIC J. SAX M.D.,<br><br>and<br><br>MAINEHEALTH,<br><br>and<br><br>SPECTRUM HEALTHCARE PARTNERS, P.A.,<br><br>    Defendants | **PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL** |

**<u>INTRODUCTION</u>**

1.  This is a medical malpractice action that arises out of a radiologist's failure to diagnose critical findings on a patient's May 29, 2023 brain imaging at the MaineHealth hospital previously-known as "Southern Maine Health Care" in Biddeford, Maine. Even though the imaging had been ordered in the emergency department to check for signs of stroke in a 63-year-old man, the radiologist failed to identify a dangerous blood clot that was at risk of dislodging and blocking the blood supply to the patient's brain. As a result of the radiologist's negligent misread of the imaging, the 63-year-old man was discharged from the hospital, and nine hours later, the untreated blood clot dislodged and progressed into a devastating stroke that left him with permanent injury.

1

**PARTIES**

2.      At all times relevant to this Complaint, Plaintiffs Jeffrey Sayward ("Mr. Sayward") and Kim Sayward ("Mrs. Sayward") have been lawfully married to each other.  Mr. and Mrs. Sayward are citizens of and domiciled in the State of Florida (City of North Port, Sarasota County).

3.      Defendant Eric J. Sax, M.D. ("Dr. Sax") is a licensed physician with a specialty of diagnostic radiology. Upon information and belief, Dr. Sax is a citizen of and domiciled in the Commonwealth of Massachusetts (City of Boston, Suffolk County).

4.      Defendant MaineHealth is a corporation incorporated in and with a principal place of business in the State of Maine (City of Portland, Cumberland County). At all times relevant to this Complaint, MaineHealth has owned, operated, and controlled the general hospital in Biddeford, Maine that was previously known as Southern Maine Health Care (now called MaineHealth Maine Medical Center Biddeford) where Jeffrey Sayward was a patient on or around May 29, 2023.  Upon information and belief, Dr. Sax was an employee and/or agent, either actual, implied, or apparent of MaineHealth, or was otherwise allowed by MaineHealth to provide diagnostic radiology services to patients at Southern Maine Health Care.

5.      Defendant Spectrum Healthcare Partners, P.A. ("Spectrum") is a corporation incorporated in and with a principal place of business in the State of Maine (City of South Portland, Cumberland County). The Spectrum medical practice provides radiologic interpretation services to hospital partners across Maine. Upon information and belief, Dr. Sax was an employee and/or agent, either actual, implied, or apparent of Spectrum, or was otherwise allowed by Spectrum to provide diagnostic radiology services to patients at MaineHealth and/or Southern Maine Health Care through Spectrum.

2

6. At all times relevant to this Complaint, it is alleged that Dr. Sax was acting in the course and scope of his employment/agency for MaineHealth and Spectrum. To the extent Dr. Sax was an employee/agent of some other practice, professional corporation, medical group, or other entity with respect to his review of Jeffrey Sayward's May 29, 2023 radiology imaging, that entity is hereby put on notice of this medical malpractice claim, as well.

7. To the extent some subsidiary, contractor, or other entity affiliated with MaineHealth actually owned, controlled, or operated that hospital or employed/contracted with its staff and/or with Spectrum and/or with Dr. Sax as of when Jeffrey Sayward was a patient on May 29, 2023, that entity is hereby put on notice of this this medical malpractice claim, as well.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because this is an action involving citizens and corporations of different states, diversity is complete, and the amount in controversy exceeds $75,000.

9. Venue is proper in the District of Maine pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this action occurred in the State of Maine, and the State of Maine where each corporate defendant (MaineHealth and Spectrum) is incorporated and has its principal place of business.

10. In accordance with the United States Supreme Court's recent holding in *Berk v. Choy*, 607 U.S. 187, 146 S. Ct. 546, (2026), this federal diversity action is not subject to the procedural requirements of the Maine Health Security Act.

3

**FACTS**

11.    Like many seasonal "snowbirds," Mr. and Mrs. Sayward travel up from Florida to spend their summers in Maine:



**Figure 1.** Mr. and Mrs. Sayward prior to his injury.

12.    On the morning of May 29, 2023, 63-year-old Jeffrey Sayward was in Maine when he experienced an episode of syncope. An ambulance transported him to the emergency department at the MaineHealth hospital then-known as Southern Maine Health Care in Biddeford, Maine.

13.    Mr. Sayward arrived at Southern Maine Health Care's emergency department at approximately 10:10 a.m. In triage, his acuity level was assessed as "emergent."

14.    MaineHealth emergency medicine attending physician Michael Burla, D.O. ordered a "CT Angiogram Head Neck" imaging scan pursuant to the stroke protocol in order to "evaluate for life threatening CNS pathology such as aneurysm, acute arterial occlusion, thrombus and/or dissection."

4

15.    The CTA Head Neck radiology imaging was obtained at Southern Maine Health Care's between approximately 11:20 and 11:34 a.m.

16.    The imaging was evaluated by radiologist Eric Sax M.D., who electronically signed his final report at 11:48 a.m.

17.    Dr. Sax failed to note a critical finding apparent on Mr. Sayward's CTA imaging: a dark filling defect of the left vertebral artery:



**Figure 2.** Mr. Sayward's 11:25 a.m. CTA imaging. The red arrow demonstrates the dark filling defect of his left vertebral artery, a critical finding that is consistent with the appearance of a thrombus (clot) at risk of dislodgement.

18.    The left vertebral artery is a major blood vessel supplying oxygen to the posterior brain. The high-grade stenosis demonstrated on the imaging in this area was consistent with the

appearance of a clot/thrombus that was at risk of dislodgement, which would put the patient at risk of infarct (stroke) if the clot/thrombus traveled "downstream" to block blood supply to one of the smaller vessels branching off the left vertebral artery.

19.    This was a critical finding that a competent radiologist was compelled to detect, document in his report, and immediately communicate to the emergency room providers.  Dr. Sax did not do so.  Dr. Sax's report incorrectly stated that the left vertebral artery was "without evidence of stenosis."

20.    The emergency department providers relied on Dr. Sax's reported "negative" Head/Neck CTA scan interpretation and discharged Mr. Sayward home, telling him he must have been lightheaded due to dehydration from golfing in the sun the day before.

21.    Falsely reassured, Mr. Sayward and his wife left the hospital at approximately 12:57 p.m.

22.    Mr. Sayward took it easy that afternoon, thinking he just needed some rest.

23.    Not long after 7 p.m., Mr. Sayward suddenly felt weak and unwell. The Saywards called 911, and paramedics responded at approximately 7:20 p.m.  Due to his apparent stroke symptoms, the paramedics transported him directly to MaineHealth's Level I Trauma Center: Maine Medical Center in Portland.

24.    Mr. Sayward arrived by ambulance at Maine Medical Center in Portland at approximately 8:17 p.m.  Within minutes of his arrival, Mr. Sayward was brought to radiology for a CTA Head Neck scan pursuant to the stroke protocol.  These images, obtained between 8:36 and 8:50 p.m., demonstrated Mr. Sayward had had a stroke.

25.    The providers at Maine Medical Center compared the 8:36 p.m. imaging from Portland to what had been taken at 11:20 at Southern Maine Health Care in Biddeford.  They saw

what Dr. Sax had missed nine hours earlier: the thrombus (clot) filling defect that had been in the left vertebral artery, as risk of becoming dislodged and turning into a stroke.

26.     The 8:36 p.m. imaging from Maine Medical Center in Portland demonstrated that thrombus *had* dislodged from the left vertebral artery and traveled through the basilar artery and left superior cerebellar artery:



**Figure 3.** Anatomical diagram demonstrating the pathway from the left vertebral artery to the basilar artery to the left superior cerebellar artery.

27.     By this point of time, nine hours later, the opportunity had been lost to treat the thrombus in the left vertebral artery before it dislodged and caused a stroke.  It was now too late, as the thrombus had progressed deeper into the brain and partly blocked the basilar artery and completely blocked the left superior cerebellar artery.  The blocked left superior cerebellar artery caused an infarction (stroke) of the superior cerebellum part of the brain.

28.    The injuries from the resulting stroke were devastating. Mr. Sayward remained hospitalized for a week, and then required a lengthy inpatient rehabilitation at New England Rehabilitation Hospital.   Despite extensive PT and OT, Mr. Sayward suffered permanent impairments due to his stroke.

29.    Mr. Sayward has undergone extensive medical treatment and will continue to require future medical care. The elements of his damages include extraordinary medical expenses; pain and suffering; loss of enjoyment of life; permanent injury; and permanent impairment.

### COUNT I:
### Negligence/Medical Malpractice (v. Dr. Sax)

30.    Plaintiffs repeat and reallege all paragraphs in this Complaint as if set forth herein in full.

31.    Dr. Sax owed Jeffrey Sayward a duty to practice safe and reasonable medicine within acceptable standards of medical care.

32.    Dr. Sax failed to meet the standard of a reasonably competent radiologist and was negligent in the care and services that he provided to Jeffrey Sayward with respect to the May 29, 2023 radiology imaging.

33.    Dr. Sax's breaches of the standard of care included, but were not limited to:

   a.   failing to accurately review and interpret the imaging;

   b.   failing to adequately identify the relevant anatomy and radiological findings;

   c.    failing to adequately document and report appropriate findings; and,

   d.   failing to communicate critical findings.

34.    As a direct and proximate result of Dr. Sax's negligence, Mr. Sayward suffered serious injury and damages as described above.   But for Dr. Sax's negligence, Mr. Sayward's

stroke and resulting permanent injury would more likely than not have been prevented.

<u><strong>COUNT II:</strong></u><br><u><strong>Vicarious Liability (v. MaineHealth and Spectrum)</strong></u>

35. Plaintiffs repeat and reallege all paragraphs in this Complaint as if set forth herein in full.

36. Dr. Sax's negligence acts and omissions were within the course and scope of his employment and/or agency for Defendants MaineHealth and Spectrum. His agency for each was actual, implied, apparent, or on the basis of employment.

37. There was sufficient employment and/or agency relationship between Dr. Sax and each of MaineHealth and Spectrum to render MaineHealth and Spectrum vicariously liable for the negligent acts and omissions of Dr. Sax.

38. As a direct and proximate result of the negligence of their employee/agent Dr. Sax, as alleged above, Mr. Sayward suffered serious injury and damages. But for Dr. Sax's negligence, Mr. Sayward's stroke and resulting permanent injury would more likely than not have been prevented.

<u><strong>COUNT III:</strong></u><br><u><strong>Loss of Consortium (v. All Defendants)</strong></u>

39. Plaintiffs repeat and reallege all paragraphs in this Complaint as if set forth herein in full.

40. As a direct and proximate result of the negligence of Dr. Sax (for which MaineHealth and Spectrum are vicariously liable), Mr. Sayward's wife, Kim Sayward, suffered the loss of the care, comfort, and society of her loving spouse. But for Dr. Sax's negligence, Mr. Sayward's stroke would more likely than not have been prevented, which in turn would have avoided Mrs. Sayward's loss of her husband's consortium.

WHEREFORE, Plaintiffs Jeffrey Sayward and Kim Sayward demand judgment against Defendants for damages, including past and future medical expenses, lost earnings and earning capacity, emotional distress, pain and suffering, lost enjoyment of life, permanent injury and impairment, punitive damages, interest, costs, and such other and further remedies as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues in this Complaint.

Dated:  May 15, 2026

*/s/ Elizabeth A. Kayatta, Esq.*
Elizabeth A. Kayatta, Esq.
Maine Bar No. 5039
Attorney for Plaintiffs Jeffrey Sayward
and Kim Sayward

Berman & Simmons, P.A.
P.O. Box 961
Lewiston, ME  04243-0961
(207) 784-3576
KayattaService@bermansimmons.com

10